[Civ. No. 1130.    Third Appellate District.—September 25, 1913.]

JACOB HILL, Administrator of the Estate of Oscar Robert Hill, Deceased, Appellant, v. PACIFIC GAS & ELECTRIC COMPANY et al., Respondents.

NEGLIGENCE—ELECTRICITY—LIABILITY OF CORPORATION FURNISHING OR USING.—An electric company which furnishes electricity to a mining company is not bound to see that the appliances constructed and managed by the mining company for the reception and use of the electricity are in a safe condition; and if an employee of the mining company is electrocuted in starting a pump operated by electricity, the doctrine of *res ipsa loquitur* has no application in determining the liability of the electric company for his death, but it has in the case of the mining company, and the negligence of the mining company is a question for the jury in an action for the wrongful death of the employee.

ID.—BURDEN OF PROOF—QUESTIONS FOR JURY.—In such action the burden of proving contributory negligence on the part of the employee in attempting to start the pump is on the mining company, and the question of such negligence, in view of the evidence adduced, is for the jury; and the trial court oversteps the boundaries of judicial power and invades the functions of the jury, if it holds the mining company not guilty of negligence and the employee guilty of contributory negligence.

ID.—QUESTION FOR COURT WHERE FACTS UNDISPUTED.—But if the facts are undisputed, the court may determine, as a matter of law, that they are insufficient to give rise to any liability on the part of the electric company for the death of the employee.

ID.—OWNERSHIP OF ELECTRICITY—PURCHASE AND SALE THEREOF.—Electricity is susceptible of ownership, and of being made a subject of purchase and sale.

NONSUIT—ADMISSION OF TRUTH OF EVIDENCE AND INFERENCE THEREFROM.—A motion for nonsuit admits the truth of the plaintiff's evidence and every inference of fact that may be legitimately drawn therefrom. The evidence should be interpreted most strongly against the defendant.

ID.—DENIAL OF MOTION FOR NONSUIT—WHEN PROPER.—If there is any substantial evidence tending to sustain the plaintiff's action, a nonsuit should be denied, without passing upon the sufficiency of such evidence; and when there is a conflict in the evidence, some of which tends to sustain the plaintiff's case, a motion for a nonsuit should not be granted.

APPEAL from a judgment of the Superior Court of Butte County and from an order refusing a new trial.   John C. Gray, Judge.

The facts are stated in the opinion of the court.

W. A. Gett, and H. D. Gregory, for Appellant.

A. F. Jones, George F. Jones, John P. Coghlan, Wm. B. Bosley, James L. Robison, and Lon Bond, for Respondents.

CHIPMAN, P. J.—This action was commenced by plaintiff as the administrator of the estate of his son, Oscar Robert Hill, deceased, to recover damages resulting from the death of the latter caused by an electric shock while in the employ of defendant, Bucket Gravel Mining Company, hereinafter referred to as the mining company.   A jury was called to try the case, and, at the close of plaintiff's testimony, each of the defendants moved for a nonsuit which was granted by the trial court.   Plaintiff's motion for a new trial was denied and thereupon judgment passed for defendants.   Plaintiff appeals for the judgment and from the order denying his motion for a new trial on statement of the case.

The relation of the defendant, Pacific Gas & Electric Company (hereinafter referred to as the electric company) to the accident, as shown by the uncontradicted testimony, very clearly appears.   This company was engaged in the business of supplying electricity for power and other purposes.   It had a line passing the mining company's dredger carrying about four thousand four hundred volts, which voltage it engaged to deliver to the mining company at a meter owned by and placed upon a pole by the electric company on the premises of the mining company.   From the meter three wires, erected by the mining company, carried the current to another pole about forty feet from the mining company's pump-house. From this pole the wires continued on to the interior of the pump-house where they entered three transformers.   When the current of electricity was desired by the mining company it was turned on by a switch at the pole last above referred to, operated by the mining company, and passed by wires thence to the three transformers above mentioned, by means of which

the electricity was reduced to the requisite voltage. It then passed from the transformers along wires to what is called a compensator or auto-starter, operated by a switch, and when opened allowed this reduced current to pass to and turn the motor which drove the pumps. After the electricity passed through the meter it was no longer under the control of the electric company. The transformers and all the machinery, wires, and attachments of every nature necessary to make use of the electricity were installed and owned by the mining company, were under its exclusive control and were operated by the mining company's servants.

Appellant devotes a large part of a two hundred-page opening brief to a discussion of the electric company's liability. He contends that a legal duty devolved upon it to supervise the installation of the appliances by which the mining company was to make use of the electricity furnished by the electric company; that a duty was also imposed upon it to make such reasonable inspections of the mining company's electrical appliances as would give assurance that they were properly performing the purpose for which they were designed; and that the doctrine of *res ipsa loquitur* should be given effect in passing upon the ruling of the trial court. This doctrine is thus stated: "When a thing which causes injury is shown to be under the management of the defendant and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence in the absence of explanation by the defendant, that the accident arose from want of care." (*Judson* v. *Giant Powder Co.*, 107 Cal. 549, 556, [48 Am. St. Rep. 146, 29 L. R. A. 718, 40 Pac. 1020].)

The maxim, *res ipsa loquitur,* is somewhat differently explained by the United States supreme court, in *San Juan Light & Transit Co.* v. *Requena,* 224 U. S. 89, 99, [56 L. Ed. 680, 32 Sup. Ct. Rep. 399], as follows: "When a thing which caused the injury without fault of the injured person is shown to be under the exclusive control of the defendant, and the injury is such as, in the ordinary course of things, does not occur if the one having such control uses proper care, it affords reasonable evidence, in the absence of an explanation, that the injury arose from the defendant's want of care." These definitions embrace the case of contributory negligence

of the injured person which is an issue in the case as to all the defendants, but we do not think it necessary to be considered with reference to the defendant electric company.

It is contended that this rule is as logically applicable ''to an injury occasioned by a current of such a dangerous element as electricity, as to an injury due to an explosion in a powder factory. In a proper case the proposition may be conceded to be sound. Considered, however, with reference to the liability of the electric company in the light of the undisputed facts, the rule, in our opinion, has no application. It is true that the thing, in the instant case, which caused the injury was originally under the management of the electric company, i. e., it produced the electricity and caused it to be conveyed and delivered, at a given point, to the mining company for its use. But the electricity which caused the injury was not, at the time and place of the injury, under the management or control of the electric company, nor were any of the appliances by which the electricity was being utilized under its management or control, nor was it in any degree responsible for any failure of these appliances to perform their offices. No causal connection of the electric company, at the time of the accident, with the thing which caused the injury was shown. It is a matter of common knowledge that electric power companies supply electricity to corporations and persons engaged in lighting cities, in operating street-cars, and in furnishing individuals with light and power. Along their lines of transmission hundreds and thousands of persons are furnished light, heat, and power in connection with the multifarious industrial enterprises in which our people are engaged. Plaintiff's contention is that because of the extremely dangerous character of this element brought into use by these electric power companies, they should be compelled not only to superintend the installation of all appliances constructed to receive and utilize this dangerous element, but should be charged with such inspections from time to time of all such appliances as would relieve the power companies from the charge of want of care and would enable them at all times to explain that any accident which might happen through its use was not the result of want of care on their part. When we consider the multitudinous uses to which electricity is now being applied and assuming that the user receives it by means

of appliances of his own choice, erected by himself, and under his own control and management, as in the present case, it would be an intolerable burden to require of the power companies what is here contended for. The rule invoked was never intended to apply to such a case. The rule was applied in the Judson Powder Company case because the explosion occurred on the company's premises and in a storage house under the company's management. But suppose the company had sold and delivered a carload of dynamite and an explosion had occurred while the car was in the possession and under the exclusive control of the railroad company. Would it be reasonable to apply the rule to the powder company because it had manufactured and sold this dangerous explosive? Suppose a company engaged in selling water which it conveys in a canal, sells a given quantity to be taken by gates to be erected and controlled by the purchaser and by him conveyed through ditches to the point of use. Is the water company to be charged with negligence for a damage that may result from some faulty construction of the headgates or ditches which it did not construct and over which it had no control? In the case before us there is no evidence and it is not contended that the electricity delivered by the electric company at the transformers, at the time of the accident, was of greater voltage than four thousand four hundred volts. The contention is that its responsibility traveled along with the current of electricity it had created and sold and that it was bound to see that all appliances constructed by the purchaser were sufficient for its safe use and that, by frequent inspections, it must inform itself that these appliances were kept in a safe condition for such use.

Appellant cites a long array of cases in support of his contention but with the exception of a single case—*Thomas* v. *Marysville Gas Co.,* 108 Ky. 224, [53 L. R. A. 147, 56 S. W. 153]—it will be seen that there was some sort of control by the defendant, either in the construction of the appliances or in operating them. With commendable candor plaintiff does not conceal the fact that the cases cited by him recognize the distinction we have pointed out. The cases are numerous holding to the view we have indicated and in some of them the doctrine of the Kentucky case is distinctly disapproved. We make reference to some of these cases.

In *Peters v. Lynchburg Light Co.,* 108 Va. 333, [22 L. R.
A. (N. S.) 1188, 61 S. E. 745], plaintiff sued to recover for
injuries caused to his wife by a shock received in turning off
an incandescent light in their dwelling.   The transformers by
which the greater voltage of defendant's wires was reduced
to that required for lighting the house were the property of
the defendant, but the house was wired by the owner.   The
transformers were not shown to be out of order or insufficient
to perform their proper office and it was not claimed that
the low tension wire leading into the house had in any way
come in contact with the defendant's higher tension wire;
nor was it shown that any excessive voltage had passed from
defendant's high tension wires to plaintiff's house wires.
There was expert evidence that there was a defective con-
tact between the brass of the light bulb and the wires in the
socket, which circumstance might account for the accident.
The trial court took the case from the jury on a demurrer to the
evidence and the Virginia supreme court of appeals affirmed
the judgment.   In the course of the opinion the court referred
to one of the cases now relied upon by appellant and it fairly
illustrates the distinguishing difference between that class of
cases and the one here.   Said the court:

"To sustain a recovery, the plaintiff relies chiefly on the
doctrine of *res ipsa loquitur,* and calls special attention to
the case of *Alexander* v. *Nanticoke Light Co.,* 209 Pa. 571
[58 Atl. 1068, 67 L. R. A. 475].   There is however obvious
dissimilarity in the facts of the two cases.   In the outset the
opinion in the Pennsylvania cases states: 'The premises of the
appellant . . . were lighted by electricity.   The electric light
was furnished by the appellee, an electric light company.   It
had wired the store and cellar of the plaintiff, furnished the
electric lamps and maintained the connections.   He went into
his cellar to show goods to a customer, and while handling
in the usual way, an ordinary incandescent light bulb, sus-
pended from the ceiling by a flexible extension cord, was
severely shocked and seriously injured.   From the facts sub-
mitted, it appeared that, when he was shocked, the electric
wires on his premises were charged with a higher voltage than
they should have carried, but the cause of this was not shown
to have been any specific negligence of the defendant.'   The

court held upon the foregoing premises that the presumption was that the company was negligent.

"The differentiating features between the Pennsylvania case and the case in judgment are the presence in the former case, and absence in the latter, of excessive voltage on the lighting wires; and the further fact that in the former case, the light company wired the plaintiff's store and cellar, furnished, the electric lamps and maintained the connections, while in this case the wiring was done and the electric outfit was owned, installed and controlled by the proprietor of the premises."

The present case is stronger than the Virginia case in the fact that there the defendant owned and controlled the transformers. Speaking of the Pennsylvania case and others, the court said: "But the doctrine of *res ipsa loquitur* has no application where the accident is due to a defective appliance under the control of the plaintiff; nor to a case involving divided responsibility, where an unexplained accident may have been attributable to one of several causes for some of which the defendant is not responsible."

In a Tennessee case, the defendant in error recovered judgment for the killing of a horse by electricity, which was tied to a pole carrying an illuminating sign in front of the house of one Roberts. The wires and appliances by which the sign was illuminated were owned and controlled by him. The accident was due to defects in these wires. The trial court excluded evidence showing ownership and control of Roberts. The appellate court said:

"If it be true that the facts were as this rejected testimony indicates, we cannot conceive of any rule of law which holds the gas and electric company liable for this loss. It is true that electricity is a subtle, and, unless controlled, a dangerous agent; yet we do not know how this fact fixes responsibility on this company when it simply furnished the electric current to the wires of Roberts, over which it had no control, and with regard to which there was on its part no duty of inspection, and when the record does not impute to it any knowledge of the defect producing the loss complained of. . . .

"We understand that liability for an injury occasioned through such a defect depends on the interest in or control

over the appliance in which the defect exists, and, if there is neither interest nor control there would be none."

Discussing the Kentucky case, the court said: "Pressed to its legitimate conclusion, we think this argument would make an electric company or a gas company an insurer against defects in appliances over which they had no control, and, to avoid liability would impose upon them the duty of continued inspection of the wires and pipes of every customer supplied with their products. This would be a burden which no such company could bear and live; and it also would be a source of annoyance to its customers, which they would not long submit to." (*Memphis Consolidated Gas & Electric Co.* v. *Speers,* 113 Tenn. 83, [81 S. W. 595].)

A similar view of the law was taken by the Iowa supreme court, in *Harter* v. *Colfax Electric Light & Power Co.,* 124 Iowa, 500, [100 N. W. 508]. An electric light fell upon the guest of a hotel and he was injured by the shock. In that case the voltage of the company's high tension wires was reduced by transformers owned and controlled by defendant, but it was not shown that the transformers were insufficient or out of order. The wiring of the hotel was not done by the defendant. The supreme court reversed a judgment for plaintiff, saying:

"The maxim *res ipsa loquitur* does not apply to such a case as this, for there is no evidence that the accident was due to a dangerous current knowingly or even negligently, sent into the hotel by the defendant company. The testimony shows that the negligence was primarily that of a third person in wiring the house in such a manner as that the fixtures were likely to fall and injure some of its occupants. Plaintiff's theory seems to be that when the wire fell upon him a short circuit was created, which did the damage complained of. This was due not to defendant sending a dangerous current into the house, but to something over which it had no control, and for which it was not responsible."

This case holds that even where the transformers are furnished and controlled by the defendant, the maxim *res ipsa loquitur* does not apply, where there is no evidence that the accident was due to a dangerous current knowingly or negligently sent into the hotel by the defendant.

See, also, *National Fire Ins. Co. et al.* v. *Denver Consol. Elec. Co.,* 16 Colo. App. 86, [63 Pac. 949] ; *Fickeisen* v. *Wheeling Electrical Co.,* 67 W. Va. 335, [27 L. R. A. (N. S.) 893, 67 S. E. 788] ; *Keefe* v. *Narragansett Elec. Lighting Co.,* 21 R. I. 575, [43 Atl. 542] ; *Minneapolis Genl. Elec. Co.* v. *Cronan,* 166 Fed. 651, [20 L. R. A. (N. S.) 816, 818–25, 92 C. C. A. 345]. See, also, note in 22 L. R. A. (N. S.) 1183, 1184, where the cases are given which recognize the distinction between cases where the injured party himself installs the appliances and cases where this is done by the company.

Our conclusion is that, so far as the electric company is concerned, the order of the trial court was justified.

We are next to examine the evidence touching the liability of the remaining defendants. In the consideration of this evidence we are to be governed by certain well-established rules which may be briefly stated. The motion for nonsuit admits the truth of plaintiff's evidence, and every inference of fact that may be legitimately drawn therefrom, and upon such motion the evidence should be interpreted most strongly against the defendant. If there is any substantial evidence tending to sustain plaintiff's action the nonsuit should be denied, without passing upon the sufficiency of such evidence; and when there is a conflict in the evidence, some of which tends to sustain plaintiff's case, a motion for a nonsuit should not be granted. (*Kramm* v. *Stockton etc. R. R. Co.,* 3 Cal. App. 606, 609, [86 Pac. 738, 903] ; *Estate of Arnold,* 147 Cal. 583, [82 Pac. 252] ; *Burr* v. *United Railroads,* 163 Cal. 663, [126 Pac. 873].)

The relation of defendant Jensen to the mining company does not clearly appear. He is spoken of in the testimony as manager and one witness mentions him as president. There is no evidence connecting him personally with operating the mining company's plant. He purchased transformers of the Westinghouse type, and other electrical appliances, concededly adequate for the purposes of reducing the current of electricity to the voltage required for the uses of the mining company. He employed the deceased to take charge of the construction work and to superintend the operation of the plant. Mr. Hill, the deceased, was twenty-seven years old, a skilled machinist of large experience but had no special knowledge of electricity, although he had worked on dredgers and at

other places where electricity was the motive power. His competency to manage the mining company's plant is not questioned, and he was paid two hundred dollars per month as wages. Hill employed an electrician, B. C. Best, who was a witness at the coroner's inquest and whose testimony was read at the trial, to install the electrical plant. Best testified that he was an electrician and had been engaged for seven years in his occupation as such; that he installed the mining company's electrical plant; that the plan was drawn by defendant Soares. "Q. Did Mr. Hill put you under his charge? A. Yes, sir; introduced me to him and told me to do the work under his instructions. I done the work and he received it and said it was all O. K.—he examined it the first thing and said it was all O. K. Q. That is the pumping plant? A. Yes, sir; where I done the work. Q. After that was installed did you run it? A. I run it two nights—twenty-four hours—two 12-hour shifts. Q. Did you find it in good condition? A. Yes, sir, so far as I could see or know." He spoke of a ground wire put in by Soares which he said he would not himself have put in because it was something new to him. He was asked if he considered it unsafe and answered: "I did not understand it at all. I made the remark that I didn't understand it—it was something new. . . . Q. Otherwise you considered the whole plant safe? A. I did; yes, sir. Q. Did you operate it with that wire on there? A. Yes, sir." It appeared that the wire he referred to was a wire connecting the auto-starter with a ground wire "running from the transformers to the river." We shall have occasion to refer to this connection later on. At present we are dealing only with defendant Jensen's relation to the accident. The undisputed testimony as to defendant Soares was that he was represented to Mr. Jensen as being "a good electrician" and "a man that has a good standing." We do not see how the doctrine of *res ipsa loquitur* or any other rule of law can be invoked to hold defendant Jensen personally responsible for what happened. He exercised ordinary care in the selection of Hill as superintendent and Hill seems to have employed competent electricians to install the electrical part of the plant.

Nor does it appear that defendant Soares failed in the exercise of due care and skill in directing Best in the work of installation. The plant was in full and successful operation

up to the day when the accident happened and, on that day after the accident and on subsequent days, the equipment performed its office as it did from the start. Witness Hillis was the agent for the sale of a different type of transformer from the Westinghouse, which latter was purchased by Jensen. In talking over the matter with Jensen, Hillis volunteered a recommendation to Jensen to "connect up" the transformer by what he called a Y or star connection and he drew a rough sketch of his suggestion and gave it to Jensen. Hillis, however, told Jensen to consult Soares about it, whom he recommended to Jensen as a good electrician and in good standing. It does not appear that Jensen showed this sketch to Soares and it does appear that Soares did not "connect up" the transformers on Hillis's plan but on his own and there is no evidence that Soares's plan was not a proper one. There was some testimony as to the ground wire connected with the transformers and a connection of this ground wire with the auto-starter, as having some possible connection with the accident. But we find nowhere in plaintiff's elaborate briefs any claim that either Jensen or Soares should be held personally liable for the accident. The contention most urgently pressed is, that the electric company is liable, and, if not, the rule of *res ipsa loquitur* casts the burden upon the mining company to explain the accident.

On the evening of the ninth day after the plant was in operation, deceased Hill told the witness Crail, whom he had hired to run the pump, to shut down and not to start it the next morning as he, Hill, wanted to be present and start it himself. Crail closed the auto-starter and shut off the current at the switch between the meter and the transformers. The next morning Hill came to the plant and by his direction Crail turned the current on and returned to the pump-house. No other person was near by. Crail testified:

"I was at the pump-house of the Bucket Gravel Mining Company on the morning of May 27, 1910, and saw Mr. Hill that morning. I saw him take hold of the auto-starter and turn the electricity on the motor and I saw him pull it open. It would not start and he shut it up again, and he pulled it open again, and still it would not start. He pulled it open again and said there was something the matter, and up over the auto-box is three fuses about that long (showing), and

he looked up at those, and I don't know whether it was the right hand fuse he took out or whether it was the middle one, and he looked at it and said, 'Yes, there it is, the fuse blew out,' and he throwed it up on a shelf behind him and got a new one to put it in and pulled it open again. Pulled out the lever and opened up the auto-box. He pulled the lever open to move it to start the machinery to run the pump. The auto-box was for running the machinery. Q. What became of him when he did that? A. He said something—he was a little taller than I was. I was on the outside of the pump-house and he was on the inside and he said something. I did not catch what was said, and I knew then that there was something the matter with him, and I looked at him and knew that he got a shock. Q. Did you mean that you knew that there was something the matter with Oscar Hill? A. Yes, sir. As soon as I looked at him I seen that he had got a shock from the electricity. Q. Well, what happened then? A. Well, I was standing on the outside of the pump-house, there was a piece of batten board lying there—a batten for battening a cabin or house—and I picked that up and tried to pry his hand loose from the auto-lever, and I couldn't do it, and I threw it down and looked down the road to see if I could see any one passing and there was no one passing and I went back to him. It seemed to me like a half hour, but I guess it was only two or three minutes, and he just fell back that way. (Showing.) . . . He took hold of the auto-starter with his right hand. He had his left hand on the water pipes. . . . He had his hands wet. You couldn't start the pump without getting your hands wet. You have to use water to start the pump. It was not over a minute or a minute and a half after he had primed the pump that he got the shock of electricity. Before he started the pump I went to the box on the pole and turned on the juice. . . . A juror: I want to ask the witness a question. Q. When Mr. Hill threw the lever back the third time did that machinery start off the same—the pump—as it always did? A. Yes, sir, it started right away as soon as he throwed it open." Shortly after Hill "just fell back that way," Crail testified that he closed the auto-starter and stopped the pump.

Dr. F. M. Whiting was called soon after the accident. He testified: "I do not think he was dead when we got there;

he was dead before we left. I found some traces of what were apparently electrical burns on the outside surface of the right hand, also in the angles of the left hand. Oscar Hill was killed by electrification.''

It appeared that the effect of the transformers was to reduce the four thousand four hundred volts entering at their primary side to a current of four hundred and forty volts at the secondary side, which was the voltage required to operate the pump. A ground wire, as we understand the evidence, was connected with the secondary or neutral side of the transformers and another wire also connected the frame or case of the auto-starter with this ground wire. Witness Hillis testified that this ground wire was not necessary to the perfect operation of the plant; that some electricians used it and others did not. Witness Best, who installed the plant, said this ground wire was proper but the wire connecting the auto-starter with it was new to him. Witness Montague, who appears to have possessed expert knowledge of the subject, gave similar testimony to that of Hillis, but both agreed that when the said ground wire was used the object was to carry off any surplus electricity as a protection to the plant and in some measure also to protect the operators. The wire connecting this ground wire with the case or frame of the auto-starter was for the purpose of carrying off through the ground wire electricity that might accumulate in this frame or case, and was a protection to the operator as well as to the auto-starter. The witnesses made use of certain exhibits, introduced by plaintiff, which were not printed in the transcript but which it was stipulated might be used at this hearing. They were not sent up with the record and we find some difficulty in clearly understanding the meaning of witnesses who used them for illustration at the trial. There was evidence that this ground wire was spliced and when examined after the accident this splice was found to be loosened and this is suggested as a possible cause of the accident—that electricity which, but for this condition of this wire, would have safely passed to the ground, found its way over the wire connecting the ground wire with the auto-starter and overcharged the frame of the auto-starter and that when Hill took hold of the handle of the switch at the auto-starter with his right hand and of the water pipe with his left hand a

cross-circuit was formed through his body and he thus received the shock. There was evidence, too, that others safely operated the plant before and after the accident while having hold of both the handle of the auto-starter and the water pipe as did Hill, but whether their hands were wet at the time did not appear. Defendants suggest the only rational explanation of the accident to be—that Hill had concededly wet hands at the time and that the testimony of Dr. Whiting shows, from the only visible wounds, that Hill's wet knuckles of his right hand in some way came too near the wires and a short circuit was thus formed with his body and his left hand grasping the water pipe and that by his contributory negligence he was killed. An examination of the testimony fails to convince one of the precise cause of the accident—whether from some faulty construction in the installation or from the splice in said ground wire working loose so as to break the contact and thus cause an undue current of electricity to pass into the auto-starter frame. The strong probability is, as appears from the evidence, that the wires leading into the auto-starter and thence to the motor, were not overcharged, else a fuse would have "blown out" and the current into the auto-starter would have been cut off and all danger removed. But the frame or case of the auto-starter may have become overcharged and the electricity thus accumulated have found its way into the handle of the auto-starter which was grasped by Hill. There was also some evidence tending to show that possibly the iron plate at the end of the ground wire which rested on the bank of earth and in the river made a somewhat faulty grounding. Witness Montague examined the plant after the accident. The system of grounding the wire leading from the transformers and the wires connecting the auto-starter with this wire was explained to him and on that hypothesis he was asked: "If there was a charge of electricity coming through these transformers and through this ground wire what would be the effect upon the compensator and upon the compensator handle, in your opinion. A. Under the conditions described by the attorneys, these transformers, as I understand it, are charged with currents. The ground wires coming from the transformers over here into the river-bed, and that ground connection consists of a short piece of iron about six inches long and one inch in diameter. Then, the case of

22 Cal. App.—51

the compensator or auto-starter in this same wire. That is, it is connected across on to this ground wire, at this point here, we will suppose. . . . Under those conditions the case of this auto-starter would be charged with a straight current that was coming off the neutral part of this transformer; and supposing this ground connection was faulty and the current not going into the ground, and secondly, the case and the auto-starter were charged— Q. (Int.) With electricity? A. (Cont.) Yes, sir. . . . Under those conditions the man would experience a shock. How great the shock would be, it would be impossible to say."

It seems to us that we have shown enough of the facts to make it reasonably clear that the doctrine of *res ipsa loquitur* applies to defendant Bucket Gravel Mining Company. The view taken by the learned trial judge is found in a written opinion printed in the transcript. After speaking of Hill as having entire charge of the machinery, "as the boss, foreman, head man and manager of the business," and after expressing the opinion that Hill met his death by a "fortuitous occurence not attributable to mistake, neglect or misconduct—by accident pure and simple," the opinion continues:

"Now, it would almost appear that he was warranted in placing one hand upon the auto-starter in starting the machine and the other upon the water-pipe and be in a perfectly safe situation, unless he did something before the third attempt to start the machinery that caused him to be electrocuted. In other words, he was electrocuted by reason of what he himself did on that occasion, and not by any defects in or of the machinery itself. Certainly it ran before that time without any trouble and after that we have the testimony of the witness Crail that there was no trouble with its working. The wires were installed by experts at the business. Every witness who testified in regard to Mr. Soares and Mr. Best pronounced them experts at the business, so that he had a perfect machine to work with and if he lost his life in working with that machinery, it was owing to his own mistake, and if such was the case, the Bucket Gravel Mining Company cannot be held to be responsible for his death."

As already noted, Hill was not an electrician, he was a machinist.  Whether or not the company furnished him "a perfect machine to work with," and whether or not "if he lost his life in working with that machinery it was owing to his own mistake," or that "he was electrocuted by reason of what he himself did on that occasion, and not by any defects in or of the machinery itself," were questions of fact about which "different conclusions upon the subject can rationally be drawn from the evidence." (*Herbert* v. *Southern Pacific Co.,* 121 Cal. 227, 229, [53 Pac. 651].) Under the rules hereinbefore stated we think it sufficiently appears that the accident was such as "affords reasonable evidence in the absence of explanation by the defendant, that the accident arose from want of care." The burden of proving the contributory negligence of Hill was on defendant. "That the existence or absence of contributory negligence is in general matter primarily for the jury there can be no doubt. . . . If but one conclusion can reasonably be reached from the evidence it is a question of law for the court, but if one sensible and impartial man might decide that the plaintiff had exercised ordinary care, and another equally sensible and impartial man that he had not exercised such care, it must be left to the jury." (*Jacobson* v. *Oakland Meat and Packing Co.,* 161 Cal. 425. [Ann. Cas. 1913 B, 1194, 119 Pac. 653].)

Again, it was said in *Payne* v. *Oakland Traction Co.,* 15 Cal. App 127, [113 Pac. 1074]. "If there is some evidence introduced on his behalf disclosing negligence in defendant and showing that plaintiff was not guilty of that degree of contributory negligence to which the cause of his injuries may directly or proximately be imputed, then the question presented is one of fact and for the solution of the jury."

It seems to us that the learned trial judge overstepped the boundaries of his judicial power and invaded the functions of the jury in deciding that defendant, Bucket Gravel Mining Company, was not guilty of negligence and that plaintiff was guilty of contributory negligence. The evidence was not such as warranted the trial court in reaching this conclusion as matter of law.

The order as to defendant, Bucket Gravel Mining Company, is reversed and as to the other defendants it is affirmed.

Hart, J., and Burnett, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on October 25, 1913, and the following opinion then rendered thereon:

CHIPMAN, P. J.—In his petition for rehearing plaintiff urges as ground therefor that, in the opinion heretofore rendered, the court invaded the province of the jury in dealing with the facts concerning the defendant, Pacific Gas & Electric Company. The petition states: "The court may possibly be right in its view of the evidence as indicated in its statement of facts, which on the basis of lack of control of the electrical company, and complete control by the mining company, would exempt the electrical company from liability and hold the mining company liable. But where did the court get its *right* to usurp the functions of the jury and, in effect, weigh this evidence at all?" We neither claimed nor exercised such right. There was no pretense by plaintiff that the electric company had any control of the electricity beyond the switch that allowed the current to pass to the transformers, and there was not a particle of evidence tending to show any control of the current by the electric company after it was received by the mining company and passed into the transformers erected by and under the exclusive control of the latter, as were all the appliances erected to utilize the current. Indeed, this state of facts appeared in plaintiff's complaint. There being no controversy as to these facts it was clearly within the province of the court to determine as matter of law therefrom whether they gave rise to any liability on the part of the electric company. It was upon this undisputed condition of the pleadings and evidence that we assumed to express our view of the law which we still think was within our province as it was also within the province of the trial court.

Petitioner cites the recent case, decided since the briefs were filed, of *Augusta Ry. & Elec. Co.* v. *Beagles,* 12 Ga. App. 849, [78 S. E. 949], as "precisely controverting the position advanced in the opinion." Plaintiff in error was the defendant in the action. Among the averments of the petitioner (complainant) he alleged that the electric company (defendant) "permitted a high and dangerous voltage to be transmitted to the secondary wires in said plant, render-

ing it dangerous for him to handle said lights, and that he was unaware of the existence of this dangerous condition''; that ''it permitted its transformer, connecting the primary with the secondary wire entering the plant, to become and remain out of repair, without sufficient insulation and in a burnt-out or punctured condition, so that electricity escaped therefrom and became grounded and liable to be communicated to persons using the electric light lamps on the secondary wire.'' In its opinion the court called attention to the evidence tending to show that the light socket was defective which might have caused the injury and for this the lumber company alone was responsible. But said the court: ''There was evidence also which tended to support the theory of the petition on the question of negligence. There was positive evidence that the primary (in charge of the electric company) and secondary wires had been permitted to come in contact with each other *outside* of the plant or the transformer, and by this contact the full current carried by the primary wires had been transmitted to the secondary wires and on into the plant.'' The trial court in that case instructed the jury—and correctly, as the appellate court seems to have intimated—''that defendant would not be liable for any injury that was received from defective appliances or wires inside of the plant, but that the electric company was only responsible for the condition of the wires outside of the lumber plant.'' This case, instead of ''precisely controverting'' the view taken in our opinion, is in perfect harmony with it.

Of course, as there was conflicting evidence, as shown in the review of the case, upon all the theories advanced, the court properly held that it was for the jury to determine the facts. Petitioner seems unable to comprehend the proposition that where the facts are undisputed the court may determine, as matter of law, that they are wholly insufficient to give rise to any legal liability.

Petitioner reiterates a point we did not heretofore consider—namely—that electricity is incapable of being made the subject of purchase and sale. The point is disposed of very satisfactorily in *Terrace Water Co.* v. *San Antonio Elec. Co.,* 1 Cal. App. 511, [82 Pac. 562], as follows: ''There may be ownership of all inanimate things which are capable of ap-

propriation by manual delivery. (Civ. Code, sec. 655). . . . It may be regarded as a solecism to say that one may own a thing not susceptible of definition and the nature and character of which is practically unknown, yet when one gathers from the elements an energy or force which he may store, transmit, and utilize, he thereby appropriates to his own use that thing, whatever it may be, and it is a subject of ownership, of barter and sale, so long as it is in his possession.''

The petition is denied.

Hart, J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on November 22, 1913.