[Sac. No. 2294.    Department Two.—November 23, 1916.]

SARAH E. BERGEN, as Administratrix, etc., Respondent, v. TULARE COUNTY POWER COMPANY (a Corporation), Appellant.

NEGLIGENCE—ACTION FOR DEATH—IMPROPER INSTALLATION OF ELECTRIC APPLIANCES—PLEADING—SUFFICIENCY OF COMPLAINT.—In an action against a power company engaged in furnishing electricity to patrons by means of wires carrying heavy currents, for damages for the death of a patron who was receiving electricity to operate a pumping plant, where plaintiff's theory was that defendant in the installing of the plant had employed dangerous and unsafe connections and a deficient ground wire, with the result that a high, dangerous, and excessive current was permitted to pass from the primary side of the transformer into the secondary side and so through a drop-cord, from which the deceased received a charge which caused his death, the complaint, setting forth that defendant improperly and carelessly constructed and installed transformers and ground wires, negligently and carelessly failed to use due care in selecting the proper materials, safety devices, and appliances for reducing the current upon the primary wires, and by reason of the fact that defendant had permitted the transformers, ground wires, and appliances to remain in a defective condition, a high and dangerous current of electricity was permitted to pass from the primary wires into the secondary wires and into the drop-cord and electric light which hung in the well-pit, is not ambiguous because the words "appliances" and "appurtenances" are used in the attempted descriptions of both the primary and secondary systems.

ID.—DISTINCT ACTS OF NEGLIGENCE—PLEADING AND PROOF.—The complaint in such a case is not open to the objection that it is ambiguous, in that it cannot be determined therefrom whether the alleged negligence consisted in improperly installing transformers, ground wires, and appliances; in lack of care in selecting proper materials and safety devices; in improper construction and maintenance of transformers, etc., or in failing properly to operate, inspect, keep, and use the transformers, as the statement in a pleading of several distinct acts of negligence, proof of any one of which would entitle a pleader to a recovery, is not properly subject to demurrer for uncertainty or ambiguity, because the plaintiff may recover "upon proof of enough to make a cause of action."

ID.—PLEADING NEGLIGENT ACTS.—The complaint in such a case is not vulnerable to the objection that the particular acts constituting the negligence of defendant were not specified, as it is well settled in California that negligence may be charged in general terms; and it is only necessary to plead what was done and allege what was negligently done without stating the particular omission which made the act negligent, but it must appear from the allegations that the negligence caused or contributed to the injury.

ID.—DEFECTIVE PLEADING—FAIR TRIAL.—Where a case is tried upon a well-defined theory, ambiguities in the complaint are not ground for reversal where the litigant was not misled and the controversy was fairly determined upon its merits.

ID. — DEFENSE — THEORY OF ACCIDENT — ABILITY OF HUMAN BODY TO RECEIVE ELECTRICITY—ADMISSIBILITY OF EVIDENCE.—In such a case, where the defendant's theory was that deceased fell from a ladder while he was going down into the well-pit where the pump was located, and that he was either killed by the fall or by the long-continuous passage of 110 volts of electricity from the drop-wire through his body, there was no error in allowing a witness to testify, over defendant's objection, that he had received a shock of 110 volts of electricity, the basis of the objection being that there was no similarity between the physical conditions of the two men, because the evidence showed that a few months before his death the deceased had been struck on the head and thereafter had been subject to headaches, but there being testimony that just prior to his death the deceased had been in good physical condition and that his heart had been strong and normal at that time.

ID.—EVIDENCE—CONDITION OF GROUND WIRE—EXAMINATION OF TEN DAYS AFTER ACCIDENT.—Testimony of an expert electrician regarding the condition of the ground wire when he examined it about ten days after the accident is not inadmissible on the ground that the time of the examination was too remote, as the objection goes more to the weight than to the relevancy of the testimony.

ID.—UNCHANGED CONDITION OF APPARATUS—PRESUMPTION NOT RETROACTIVE.—The presumption of unchanged condition is not retroactive

in such a case, and the mere production of the pipe and wire would not prove that they were in the same state ten days after the accident as they were on that day, but where there was some evidence tending to show that no change had taken place during that interval, the evidence was admissible.

ID.—THEORY OF ACCIDENT—SUFFICIENCY OF EVIDENCE.—In this case, the testimony entirely sustained the theory of plaintiff as to the manner of deceased's death, and that it was caused by reason of the faulty and negligent installation and operation of the system in use at the pumping plant.

ID.—EVIDENCE—BY-LAWS OF DEFENDANT—INADMISSIBILITY OF.—In such a case, defendant's liability being based upon its negligence in *putting in* the pumping plant originally, there was no error in excluding from evidence the by-laws of the defendant offered for the purpose of showing that it was the deceased's duty to care for the electric plant after its installation.

ID.—WHEN VERDICT NOT EXCESSIVE.—A verdict of twelve thousand five hundred dollars for the death of a man leaving a widow and minor children and having a life expectancy of sixteen years, earning about fifty dollars a month during one-half of his working time, and the other half of his time being spent in conducting his ranch, is not excessive. The jury in such a case is also justified in considering the loss to the widow and minors due to the deprivation of the comfort, society, protection, and support of the husband and father.

ID.—MORTALITY TABLES—INSTRUCTIONS.—An instruction in such a case relative to the use of mortality or expectancy tables is not objectionable on the ground that it is applicable to the case of a man in good physical condition, while the deceased was a victim of a recent injury which had impaired his health, where the physician who treated him at the time of the prior accident described him as a "strong, hearty man" when the accident resulting in his death occurred.

ID.—CARE REQUIRED BY COMPANY.—An instruction that a company engaged in furnishing that dangerous commodity, electricity, is not an insurer, but where it affords "the means for the service," it is required to use "very great care," is not objectionable in the use of the expression "very great care"; nor is the instruction open to the criticism that it would lead the jury to believe that defendant owned and controlled *all* of the instrumentalities for the application of electric power, including the machinery and wires of the pumping station itself, where there was no question that defendant had installed the instrumentalities owned and used by the deceased, and in that sense had afforded means for the service.

ID.—CARE TO BE USED BY CUSTOMER.—An instruction is not open to the objection that it failed to apprise the jury of the deceased's duty

to exercise ordinary care, where it stated that if by reason of defendant's installation of dangerous connections and defective ground wires an excessive voltage of electricity was permitted to enter the drop-cord in the pit, and if plaintiff's intestate, "while using ordinary care," came in contact with the cord and was killed, plaintiff was entitled to recover.

ID.—BURDEN OF PROOF—DOCTRINE OF RES IPSA LOQUITUR.—An instruction that if plaintiff had established by a preponderance of evidence the death of her decedent while he was exercising ordinary care, by an excessive and dangerous current furnished by defendant through the electric light wire, it then devolved upon defendant to show that the excessive voltage was not due to its negligence, does not unduly extend the doctrine of *res ipsa loquitur.* It is the rule in this state that where electricity is furnished to a system installed and operated exclusively by the owner of the premises, the doctrine of *res ipsa loquitur* has no application. But where the defendant in such a case had some control of the situation either by reason of its construction or its operation of plaintiff's plant, a showing of the accident without plaintiff's fault shifts the burden of proof.

ID.—INSTRUCTION ON SECTION 3281, CIVIL CODE.—An instruction in its material part quoting section 3281 of the Civil Code, defining damages, has no tendency to impress the jury with the idea that the defendant corporation was a law-breaker.

ID. — REPEATED INSTRUCTIONS ON DAMAGES — LACK OF ERROR. — The criticism of the instructions in such a case that they unduly emphasized the matter of damages because seven of them made mention of that subject, although no objection to the substance is made, but merely that devoting so much attention to the matter of damages might well have led the jurors to believe that plaintiff was entitled to compensation, has no substantial merit.

APPEAL from a judgment of the Superior Court of Tulare County, and from an order denying a new trial. J. A. Allen, Judge.

The facts are stated in the opinion of the court.

E. I. Feemster, Charles E. Bush, and A. E. Cooley, for Appellant.

Murry & Knupp, for Respondent.

MELVIN, J.—Defendant appeals from an adverse judgment and from an order denying its motion for a new trial. The action was one for damages sought by Sarah E. Bergen,

as administratrix of the estate of L. C. Bergen, deceased, on account of his death. The verdict in favor of plaintiff was for twelve thousand five hundred dollars.

Bergen was a rancher living near Strathmore, in Tulare County. He had a wife and two minor children, the latter being at the time of his death respectively seventeen and ten years of age.

Water for irrigating the orchard on Mr. Bergen's ranch was raised from a well by means of a pumping plant operated by electricity. This plant had been installed about a year previous to Mr. Bergen's death by the defendant corporation, which is a power company engaged in furnishing electricity to its patrons by means of wires carrying heavy currents.

During a few days before that upon which the accident occurred, Mr. Bergen had been having trouble with the pumping plant and on that evening, when he arrived at his home, his wife told him that something was wrong with the pump. He replied that the pump was all right, but that there was not enough power coming over the wires to move both the motor and the pump. About 9 o'clock Mr. Bergen went to the pumping plant for the purpose of discovering, if possible, the cause of the trouble with the supply of power. After vainly awaiting his return for about an hour his wife and daughter caused search to be made for him. His dead body was found in the well-pit behind the pump. Deceased was in a kneeling posture, his head resting against the discharge pipe leading from the pump. In his hand was held the lamp socket on the drop-cord suspended in the pit. His hands were severely burned, and the physician who examined the body declared that death resulted from electric shock. There was evidence to the effect that glass from broken lamp globes was found scattered about the place; that the motor was burned out; that the insulation on the lamp-cord was badly punctured, and that the coating of the jacket which is set over the lamp socket to prevent contact between the interior electrical connection and the brass case was completely burned away over one of the terminals.

Appellant delivered its current to Mr. Bergen by means of its primary power wires which terminated at a pole a few feet from the pumping plant. The primary wires carried

six thousand six hundred volts. By means of "trans-
formers," a current of 220 volts was taken off of these wires
for the engine and one of 110 volts for the electric lighting.
Respondent's theory developed at the trial by the evidence
in her behalf was that appellant in the installing of the plant
had employed dangerous and unsafe connections and a defi-
cient ground wire, with the result that a high, dangerous,
and excessive current was permitted to pass from the primary
side of the transformers into the secondary side and so
through the drop-cord into Mr. Bergen's body.

Appellant's first attack is directed against the order of the
court overruling the demurrer to the complaint. That plead-
ing set forth with some elaboration the statements that de-
fendant improperly and carelessly constructed and installed
transformers and ground wires; negligently and carelessly
failed to use due care in selecting proper materials, safety
devices, and appliances for reducing the current carried by
the primary wires; and that by reason of the fact that de-
fendant had permitted the transformers, ground wires, and
appliances to remain in a defective condition, a high and
dangerous current of electricity was permitted to pass from
the primary wires into the secondary wires and into the
drop-cord and electric light which hung in the pit. Appel-
lant complains of ambiguity because the words "appliances"
and "appurtenances" are used in the attempted descrip-
tions of both the primary and the secondary systems. There
is no merit in this contention. The complaint clearly sets
forth the theory of the accident upon which respondent relies.
Appellant also complains of ambiguity in the pleading re-
sulting in its inability to determine therefrom whether its
alleged negligence consisted in improperly installing trans-
formers, ground wires, and appliances; in lack of care in
selecting proper materials and safety devices; in improper
construction and maintenance of transformers, etc.; or in
failing properly to operate, inspect, keep, and use the trans-
formers, etc. The statement in a pleading of several dis-
tinct acts of negligence, proof of any one of which would
entitle the pleader to a recovery, is not properly subject to
demurrer for uncertainty or ambiguity because the plaintiff
may recover "upon proof of enough to make a cause of
action." (6 Thompson on Negligence, 2d ed., sec. 7474.)

Nor was the complaint vulnerable to the objection that the particular acts constituting the negligence of defendant were not specified. It is well settled in California that negligence may be charged in general terms. It is only necessary to plead what was done, and allege that it was negligently done without stating the particular omission which made the act negligent. But it must appear from the allegations that the negligence caused or contributed to the injury. (*Smith* v. *Buttner,* 90 Cal. 95, [27 Pac. 29]; *Stein* v. *United Railroads,* 159 Cal. 368, [113 Pac. 663]; *Champagne* v. *Hamburger & Sons,* 169 Cal. 683, [147 Pac. 954].) Measured by this rule the complaint was sufficient. The order overruling the demurrer to the complaint was a proper one. The case was tried upon a well-defined theory, and even if the complaint had contained the defects of which the demurring party complained, that litigant was not misled because the controversy was fairly determined upon its merits. (*Bank of Lemoore* v. *Fulgham,* 151 Cal. 234–237, [90 Pac. 936]; *Stein* v. *United Railroads,* 159 Cal. 368, [113 Pac. 663]; *Irrgang* v. *Ott,* 9 Cal. App. 440–442, [99 Pac. 528].)

It was defendant's theory that Mr. Bergen fell from the ladder while he was going down into the pit where the pump was located, and that he was either killed by the fall or by the long-continued passage of 110 volts of electricity from the drop-wire through his body. While Mr. Gardiner, an electrician, was under examination as a witness he was asked if he had ever received a shock of 110 volts of electricity. He answered in the affirmative over the objection of defendant's counsel. The basis of the objection was that there was no similarity between the physical conditions of the two men, because the evidence showed that a few months before his death Mr. Bergen had been struck on the head and thereafter had been subject to headaches. The testimony was properly admitted. While it was true that there had been evidence tending to prove an injury to Mr. Bergen which had left some painful results, there had been medical testimony also to the effect that just prior to his death Mr. Bergen had been in good physical condition, and that his heart had been strong and normal at that time. It was therefore competent for plaintiff to offer evidence regarding the result of suffering a shock of 110 volts of electricity by a man of average

physique and resistant powers. If the witness had been un-
usually powerful and capable of withstanding a . heavier
shock than the ordinary man, even that fact would have re-
lated more to the weight than to the admissibility of the tes-
timony. But it does not appear that he was at all abnormal.

Mr. Gardiner also testified regarding the condition of the
ground wire when he examined it about ten days after the
accident. Objection was made upon the ground that the time
was too remote, but we cannot say that the court erred in
exercising discretion in favor of the admission of this tes-
timony. That ten days had elapsed between the accident
and the electrician's inspection of the ground wire was a fact
going more to the weight than to the relevancy of this tes-
timony. It is the contention of appellant's counsel that
upon plaintiff devolved the duty of proving that no change
had taken place in the condition of the ground wire and the
buried pipe between the time of the accident and Mr. Gard-
iner's inspection of it. It is quite true that, as appellant
contends, the presumption of unchanged condition is not
retroactive, and that the mere production of the pipe and wire
would not prove that they were in the same state ten days
after the accident as they were on that day. (*Windhaus* v.
*Bootz,* 92 Cal. 617–621, [28 Pac. 557]; *Cerruti Mercantile
Co.* v. *Simi Land Co.,* 171 Cal. 254–256, [152 Pac. 727].)
But there was evidence tending to show that no change had
been made during that interval. Miss-Hazel Bergen testified
that so far as she knew nothing was done between the date of
the accident and the coming of Gardiner to connect the plant
with the system of the Mt. Whitney Power Company, except
that the defendant caused its power to be disconnected. She
said: "I was not around the plant myself and I did not see
anybody else around there." Mr. Gardiner testified that
he did not touch the wire prior to the time it was examined
by witness Davis, who went to the scene of the accident thir-
teen days after Mr. Bergen's death. Davis said he was ac-
companied by Mr. Knupp, plaintiff's attorney. They found
a ground wire and rod or pipe and pulled the rod up. It
gave no indication of having been lately tampered with and
it looked as if it had been imbedded in the earth at that place
for a long time. This rod was in the same place indicated
in the testimony of witness Kratzer, who had installed the
wiring and at the time of its removal it was still connected

with the ground wire running the full length of the pole. Mr. Knupp corroborated the statements of Mr. Davis. We think this testimony fairly established the fact that no material change had been made in the rod and the wire during the thirteen days following the accident. Kratzer had sworn that the ground wire was attached to the pipe or rod with solder, and that the latter had been driven into the ground about five feet or nearly its entire length. The testimony of Davis, Knupp, and Gardiner was in contradiction to this statement. Gardiner said that the wire was loosely attached to the pipe but was not soldered; and Davis testified that there never had been any good connection with solder between the wire and the ground pipe or rod, and that the latter was corroded. The rod, together with about two feet of the attached wire, was introduced in evidence. Mr. Gardiner said that if the primary and secondary wires were grounded together and the primary ground wire and rod were not sufficient, the primary voltage would go into the secondary. "In such a case," he said, "if a man attempted to turn on his light in the well-pit, if he would come in contact with a bare place or some current would jump through on the socket, the primary would go on through the secondary to the ground and whatever was connected with it. If he made a better ground than the company made in this case, he would be in direct contact with the primary voltage." This testimony entirely sustained plaintiff's theory of the manner in which Mr. Bergen met his death. Mr. Davis, another electrician, gave it as his opinion that the grounding of the system at the Bergen pumping plant was unsafe, for the reason "that the primary or high tension wire and the secondary or low tension wire are in direct metallic contact with each other, and also grounded through this same wire; one wire runs down the pipe. In other words, the primary ground is not grounded separate from the secondary; they are both tied together with a common ground." Continuing he said:

"The effect is this: If you remove that ground wholly your primaries and secondaries are in direct metallic connection with each other. The only difference in the potential you would have would be due to the subtraction of the windings of the transformer, which would be a small amount." The witness was asked the further question:

"If this ground was insufficient and the primary and the secondary sides of the transformer were connected as Mr. Kratzer has described them here, what would be the effect upon a person who attempted to turn on a light in the pit?" Over objection he answered:

"I should say that he would be very apt to replace that defective ground with his body."

Mr. Noble, a graduate of and a former assistant professor of electrical engineering in the University of California, testified that 110 volts, the normal current in the lighting circuit at the Bergen plant, would not in his opinion injure a man in good health having a normal heart. He also gave it as his opinion that in the wiring of the Bergen place the method which had been followed was very unusual and dangerous. He said: "The danger lies in the fact that the primary or high voltage side and the secondary or low voltage side of the transformer are connected together and then are connected to a ground wire. The loosening of that ground wire or severing of that ground wire from its ground connections would immediately cause a considerable rise in the voltage between the secondary, low tension wires and the ground."

Professor Noble also testified as follows: "If the ground were totally deficient in this case and a person came in contact with the lamp-cord in the pit under the circumstances testified to in this case, he would get, in my opinion, in the neighborhood of two thousand eight hundred volts between the wires on the low-tension side and the ground, assuming that the ground connections became totally loose." He also inspected the ground wire and pipe or rod which were brought into court and gave it as his opinion that they would not make a good ground. This witness also examined the lamp cord and socket which had been found in the hand of the dead man, and gave it as his opinion that their conditions indicated the passage of a current of high potentiality greatly in excess of 110 volts.

This evidence fully supported plaintiff's theory that decedent met his death by reason of the faulty and negligent installation and operation of the system in use at the pumping station on the Bergen ranch.

There was no error committed by the court in refusing to admit defendant's by-laws in evidence. We can see no possible connection between said by-laws and the defendant's

obligations to plaintiff's decedent. It is argued that they might have shown Mr. Bergen's duty to care for his own electric plant after its installation, but defendant's liability was based upon its negligence in *putting in* the pumping plant originally.

The amount of damages was not excessive. Appellant attacks the verdict upon the ground that Mr. Bergen's earning capacity was but fifty dollars a month, and counting his life expectancy as sixteen years, the greatest possible pecuniary loss would be about nine thousand six hundred dollars, assuming that his earning capacity would have remained the same if he had lived. The evidence showed, however, that he earned fifty dollars a month during about half of his working time and that the other half of his time was spent in conducting his ranch. The jury was justified also in considering the loss to the widow and the minors due to the deprivation of the comfort, society, protection, and support of the husband and father.

We find no error in the instructions. Appellant attacks instructions numbered 8, 9, 10, 11, and 12. The first of these related to the use of mortality or expectancy tables and was based upon an instruction approved in *Harrison* v. *Sutter St. Ry. Co.,* 116 Cal. 156–168, [47 Pac. 1019]. The objection made to the giving of such an instruction is that it is applicable to the case of a man in good physical condition, while Mr. Bergen was the victim of a recent injury which had impaired his health. It is true that there was some evidence that he had suffered injuries in a run-away which occurred about two months before his death, but the physician who had treated him at that time described him as a "strong, hearty man" when the accident occurred.

Instruction number 9 related to the great care exacted of companies like defendant engaged in furnishing that dangerous commodity, electricity. The jurors were told that such a company is not an insurer, but where it affords "the means for the service," it is required to use "very great care." Appellant's counsel say that the instruction is erroneous because of the use of the expression "very great care." There is no force in this objection. (*Giraudi* v. *Electric Imp. Co.,* 107 Cal. 120–124, [48 Am. St. Rep. 114, 28 L. R. A. 596, 40 Pac. 108]; *Tackett* v. *Henderson Bros. Co.,* 12 Cal. App. 658, [108 Pac. 151]; *Fairbairn* v. *Ameri-*

*can River Electric Co.,* 170 Cal. 115–118, [148 Pac. 788].)
The instruction is not open to the criticism that it would
lead the jury to believe that defendant owned and controlled *all*
of the instrumentalities for the application of electric power,
including the machinery and wires of the pumping station
itself.   There was no question but that defendant had in-
stalled all of the instrumentalities owned and used by Mr.
Bergen, and in that sense it had afforded means for the
service.   The instruction was approved by the supreme court
of Alabama in *Alabama City etc. R. R. Co.* v. *Appleton,* 171
Ala. 324–331, [Ann. Cas. 1913A, 1181, 54 South. 638].

Defendant criticises the tenth instruction upon the ground
that it failed to apprise the jury of Mr. Bergen's duty to
exercise ordinary care, but the instruction *in terms* does state
his duty in that regard.   In brief, it informed the jury that
if by reason of defendant's installation of dangerous connec-
tions and defective ground wires an excessive voltage of
electricity was permitted to enter the drop-cord in the pit,
and if plaintiff's intestate, "while using ordinary care,"
came into contact with the cord and was killed, plaintiff was
entitled to recover.

The eleventh instruction stated the rule that if plaintiff
had established by a preponderance of evidence the death
of her decedent while he was exercising ordinary care, by
an excessive and dangerous current furnished by defendant
through the electric light wire, it then devolved upon defend-
ant to show that the excessive voltage was not due to its
negligence.   This did not unduly extend the doctrine *res
ipsa loquitur* as appellant complains that it did.   Such con-
trol as Mr. Bergen exercised over the equipment of his
pumping station could not have resulted in an increase of
the voltage; therefore the presence of a death-dealing current
in the wire through which defendant had contracted to fur-
nish a current of 110 volts was sufficient to afford reasonable
evidence of negligence on its part.   It is the rule in this state
that where electricity is furnished to a system installed and
operated exclusively by the owner of the premises, the doc-
trine *res ipsa loquitur* has no application.   (*Hill* v. *Pacific
Gas and Electric Co.,* 22 Cal. App. 788, [136 Pac. 492].)
But where the defendant in such a case had some control of
the situation either by reason of its construction or its opera-

tion of plaintiff's plant, a showing of accident without plaintiff's fault shifts the burden of proof.

The jury was carefully instructed that the mere happening of the accident raised no presumption of defendant's negligence.

The twelfth instruction was in its material part a quotation of section 3281 of the Civil Code, defining damages. It had no tendency to impress the jury, as appellant fears, with the idea that the corporation was a law-breaker.

The final criticism of the instructions is that they unduly emphasized the matter of damages because seven of them made mention of that subject. No objection is urged to the substance of these instructions, but we are told that devoting so much attention to the matter of damages might well have led the jurors to believe plaintiff entitled to compensation. With equal force it might be said that the court's elaboration upon that subject might have caused jurors to devote great care to the consideration of the evidence before they could feel justified in awarding a verdict requiring defendant to pay damages. Defendant's point has the charm of novelty but possesses no substantial merit.

Other questions discussed in the briefs do not require consideration here, as they are substantially covered by that which is written above.

The judgment and order are affirmed.

Henshaw, J., and Lorigan, J., concurred.