[Civ. No. 14599.  First Dist., Div. Two.  Mar. 13, 1951.]

ATLAS ASSURANCE COMPANY, LTD., et al., Respondents, v. STATE OF CALIFORNIA, Appellant.

Edmund G. Brown, Attorney General, Harold B. Haas, and Miriam E. Wolff, Deputy Attorneys General, for Appellant.

H. A. Thornton, E. M. Taylor and Thornton & Taylor for Respondents.

SCHOTTKY, J. pro tem.—The State of California appeals from a judgment against it in the sum of $52,617.56 in an action brought by respondents, subrogees of the Pacific Gas and Electric Company, for damages alleged to have been caused by negligence of appellant's employees in the operation of the State Belt Railroad.

Certain facts were undisputed and the parties entered into the following agreed statement of facts:

"It is agreed that shortly after the inception of World War II, the Government of the United States took over and

occupied the property lying to the south of Beach Street, between Powell and Taylor, for Government yards and warehouses, and for the handling and storage of supplies en route to the South Pacific area;

"That, to serve these yards, a track was installed on Beach Street, with numerous spurs leading into said yards, which track and spurs were used by the State Belt Line Railroad to switch and deliver cars to and into said yards. That said track on Beach Street was elevated from three to four feet above the level of the street.

"That on January 8, 1944, said State Belt Line Railroad had 'spotted' a box car on one of these spurs, known as No. 7, so close to the main line tracks as to prevent clearance by cars being switched on the main line on Beach Street.

"That on said January 8, 1944, said Belt Line Railroad, operated by the State of California, under the supervision and control of the State Board of Harbor Commissioners, was switching certain cars on said tracks in a westerly direction. That the end (or most westerly) car of said train struck said car spotted on spur No. 7.

"That, as a result of said collision, said end car, which was refrigerator car No. 92200 of the Pacific Fruit Express, was thrown from its tracks and down said embankment, falling against a power line pole of the Pacific Gas and Electric Company, situated approximately nine feet northerly of the nearest rail of said track and 140 feet easterly of Mason Street, on Beach Street.

"That the impact of said car broke said pole off at the ground level, splintering it for a distance of six feet or more above the ground and displacing said pole six feet to the north, into the street.

"That two other poles were broken by the strain thrown on them. The first was the one immediately to the west of the pole which was struck, this pole also being broken off at the ground line. The other pole so broken was at the southwest corner of Beach and Mason Streets.

"These poles carried an 11,000 volt feeder, known as Q-1102KV, in other words, the No. 2 line carrying that voltage into Station 'Q', located at 320 Beach Street, at the northwest corner of Mason, in the City and County of San Francisco.

"That on the pole next westerly from that struck was a buck-arm, attached to and leading from which was an 11,000 volt line leading northerly across Beach Street.

"That the 11,000 volt line running east and west on Beach Street consisted of four wires, being, in order from north to south, the neutral, the red, white and blue phases. The line leading northerly across Beach Street consisted of three wires, being the red, white and blue phases, without a neutral wire.

"That the shattering and displacement of the pole, struck by said car, and of the pole to the west, caused a sag in said Q1102 wires, dropping them onto the wires leading northerly across Beach Street. That, as a result of such contact, all of said wires shorted, burned off and fell into the street.

"That at that time a fire occurred at generating station 'Q' of the said Pacific Gas and Electric Company. That one of the issues in this case is whether the fire was caused or contributed to by the said short circuit in said wires and whether, if said short circuit caused or contributed to said fire, said fire was not also caused or contributed to by negligence of the Pacific Gas and Electric Company, its agents, servants, or employees. That the amount of damage caused by said fire is also an issue in this case, but that it is agreed that the total damage to Pacific Gas and Electric Company resulting from both the collision or allision of the said refrigerator car with the power line pole together with the short circuit and the fire was in the sum of $52,617.56.

"It is further admitted by defendant State of California that said defendant is liable for the damage to poles and lines located outside the power station 'Q' of the Pacific Gas and Electric Company, caused by the collision or allision of the said refrigerator car and pole and will consent to judgment against it in the amount of that damage when ascertained.

"That the following plaintiffs had, prior to said fire, issued to said Pacific Gas and Electric Company policies of insurance. That by reason of said fire said Pacific Gas and Electric Company made claim against each of said companies. That by reason of said fire and said claims said plaintiff companies paid to said Pacific Gas and Electric Company the amount hereafter set opposite their respective names, and that, by reason of such payments and of the terms and conditions of the policies under which such payments were made thereunder, the following plaintiffs have been subrogated to such rights, if any, which the Pacific Gas and Electric Company have herein, to the extent of such payments:

(There follows a list of the companies and the amounts paid.)

"That said Pacific Gas and Electric Company filed a claim with the State Board of Control in the form and amounts hereto attached and marked 'Exhibit A', on December 21, 1945. That on November 25, 1947, after due hearing, said State Board of Control refused to allow said claim or any part thereof.

"That the allegations contained in paragraphs I and II of the complaint for damages are true; the allegations being:

"That 'plaintiffs above named, save and except for Underwriters at Lloyd's, London, which is a voluntary association, created, organized and existing under the laws of Great Britain, are and each of them is a corporation, created, organized and existing under the laws of the following states or countries:

(There follows a list of the companies and their place of incorporation.)

" 'Defendant the State of California owns and operates within the City and County of San Francisco, State of California, a railroad known as the State Belt Railroad; that the defendant operates said railroad through a Board of State Harbor Commissioners having an office and place of business in said City and County of San Francisco, State of California.' "

There is attached to the stipulation the claim of the Pacific Gas & Electric Company, before the Board of Control of the State of California, which reads: " 'In the Matter of the Claim of Pacific Gas and Electric Company, a corporation, against the State of California.

" 'The undersigned claimant hereby makes claim against the State of California in the sum of Eighty-two Thousand Nine Hundred Eighty-seven and 93/100 Dollars, pursuant to the provisions of Section 16021, Government Code, and in support of said claim represents as follows:

" 'On January 8, 1944, employees of the State Belt Railroad carelessly and negligently operated railroad cars and switching devices on Beach Street between Powell and Mason Streets at approximately 2:12 a. m., that as a proximate result thereof a refrigerator car, No. 92200 of the Pacific Fruit Express became derailed and struck a pole on the south side of Beach Street between Powell and Mason Streets on which was suspended various power wires belonging to the Pacific Gas and Electric Company and used for the purpose of transmitting electrical energy. The impact was of such force that it broke the pole, causing a short circuit and an unusually

heavy stress on the power system because of its close proximity to Generating Station Q. This sequence of events resulted in an arc which ignited the insulating oil in the regulators and transformers located in said generating station, and the flames in spreading were communicated to all adjacent inflammable electrical and building equipment resulting in the damage hereinafter itemized, commencing at page 2 of this claim.

" 'Pacific Gas and Electric Company makes this claim on its own behalf and also on behalf of the following named insurance companies who, by reason of the respective payments noted opposite the name of such company and the policies of insurance under which said payments were made, have been subrogated to the rights of Pacific Gas and Electric Company to the extent of such payments.' "

It was the position of the appellant at the trial that while it admitted liability for its negligence in the hitting of the pole and consequent breaking of the wires, it denied liability for the damage done to Substation "Q" by the explosion and fire caused by an arc which ignited the insulating oil in the regulators and transformers therein. Appellant contends that certain evidence was excluded that should have been admitted as bearing on the contributory negligence of the Pacific Gas and Electric Company in the equipment and maintenance of its substation, that this excluded evidence would also have tended to prove that appellant's negligence was not the proximate cause of the damage to the substation, that respondents' subrogor failed to mitigate damages, and that it was making an extraordinary use of its property.

Appellant introduced in evidence a series of questions and answers that had been previously submitted to the Pacific Gas and Electric Company and answered by it, which gave a full description of the physical condition of Substation "Q"; the amount of power which was flowing in and out of said substation; the location of the short circuits; and a description of the various protective devices installed by the electric company. These answers disclosed that Station "Q" was completed in 1908 and placed in operation that year by Great Western Power Company, was taken over August 1, 1930, by Pacific Gas and Electric, that since that time there had been no change made in capacity of boilers, turbines, generators, incoming and outgoing circuits.

Appellant called as a witness a Mr. Blanchard, an expert in the field of electrical engineering, who calculated the

minimum and maximum current on the short circuit, a minimum of 9,000 amperes, a maximum of 18,000 amperes. Mr. Creim, the Regional Power Manager for the United States Bureau of Reclamation at Sacramento, was then called to testify as an expert in the field of design, management and supervision of electrical power systems. He testified that the arc, created at the point where the wires in the street crossed when the pole was hit by the railroad car, could not of itself cause the fire in Substation "Q," a distance of 140 feet away from the collision, and that there could not have been a fire in said substation unless an arc was formed within the vault. Basing his testimony on the description of the equipment given by the Pacific Gas and Electric he stated that the arc which caused the fire occurred inside the regulator in Substation "Q," and that to cause the arc there had to be a short circuit in that regulator. He calculated that the short circuit here involved amounted to 9,500 amperes.

Appellant then attempted to demonstrate the inadequacy of the equipment in Substation "Q" to handle a short circuit of the magnitude caused by the breaking of the wires by defendant, it being the state's theory that ordinary reasonable care in the maintenance and operation of such a substation would require anticipation of short circuits of such magnitude and the provision of equipment to absorb them without material damage to the substation. Defendant attempted to do this by asking the expert witness Creim a series of questions, by the answers to which defendant expected to prove that the power station was not operated, maintained nor designed in accordance with present day reasonable engineering standards and that the fire would not have occurred if said power station had been so designed, equipped, operated and maintained.

Respondents objected to the admission of this line of testimony upon the ground that evidence tending to establish contributory negligence was inadmissible. The trial court sustained the objections and excluded the testimony and the principal issue presented on this appeal is as to the propriety of the defense of contributory negligence.

The principal case relied on by respondent is *Kleinclaus* v. *Marin Realty Co.*, 94 Cal.App.2d 733, where this court said at page 738 [211 P.2d 582]:

"The tenor of the vast majority of the decisions is that a landowner may make any lawful use of his land and that it is not contributory negligence to neglect to take precautions to avoid future injury which can only occur as the result of

another's negligence. As so tersely expressed by the United States Supreme Court in the passage above quoted from the LeRoy Fibre Company case: 'The tangibility of property is in its uses and that the uses by one owner of his property may be limited by the wrongful use of another owner of his, is a contradiction.' . . .

"We are satisfied to hold that plaintiffs were not obliged to anticipate the negligent flooding of their land by defendants and that their permitting the drainage ditch to become clogged before the flooding started cannot constitute contributory negligence. If they had chosen to fill up the drainage ditch deliberately before the danger from flooding by defendants' negligence occurred they would only have been exercising the rights of an owner to use his land in any lawful fashion."

The Kleinclaus case cites with approval *LeRoy Fibre Co.* v. *Chicago, M. & St. P. Ry. Co.*, 232 U.S. 340 [34 S.Ct. 415, 58 L.Ed. 631], a case dealing with the negligent setting of a fire on plaintiff's property by an adjoining railroad, where the court said at pages 349, 350:

"That one's uses of his property may be subject to the servitude of the wrongful use by another of his property seems an anomaly. It upsets the presumptions of law and takes from him the assumption and the freedom which comes from the assumption, that the other will obey the law, not violate it. It casts upon him the duty of not only using his own property so as not to injure another, but so to use his own property that it may not be injured by the wrongs of another. How far can this subjection be carried? Or confining the question to railroads, what limits shall be put upon their immunity from the result of their wrongful operation? In the case at bar, the property destroyed is described as inflammable, but there are degrees of that quality; and how wrongful must be the operation? In this case, large quantities of sparks and 'live cinders' were emitted from the passing engine. Houses may be said to be inflammable, and may be, as they have been, set on fire by sparks and cinders from defective or carelessly handled locomotives. Are they to be subject as well as stacks of flax straw, to such lawless operation? And is the use of farms also, the cultivation of which the building of the railroad has preceded? Or is that a use which the railroad must have anticipated and to which it hence owes a duty, which it does not owe to other uses? And why? The question is especially pertinent and immediately shows that the rights of one man

in the use of his property cannot be limited by the wrongs of another. The doctrine of contributory negligence is entirely out of place. Depart from the simple requirement of the law, that every one must use his property so as not to injure others, and you pass to refinements and confusing considerations. There is no embarrassment in the principle even to the operation of a railroad. Such operation is a legitimate use of property; other property in its vicinity may suffer inconveniences and be subject to risks by it, but a risk from wrongful operation is not one of them.

''The legal conception of property is of rights. When you attempt to limit them by wrongs, you venture a solecism. If you declare a right is subject to a wrong you confound the meaning of both. It is difficult to deal with the opposing contention. There are some principles that have axiomatic character. The tangibility of property is in its uses and that the uses by one owner of his property may be limited by the wrongful use of another owner of his, is a contradiction.''

(See also *Yik Hon* v. *Spring V. W. W.*, 65 Cal. 619 [4 P. 666]; *Steele* v. *Pacific Coast Ry. Co.*, 74 Cal. 323 [15 P. 851]; *Flynn* v. *San Francisco & S. J. R. Co.*, 40 Cal. 14 [6 Am.Rep. 695].) And in 65 Corpus Juris Secundum 713, section 118, it is stated: ''It has generally been held that the rule which requires one to exercise ordinary care to protect himself from the results of the negligence of others is subject to the exception that, as a person is entitled to use his own premises for any lawful purpose, his failure to protect them from the negligence of another will not be contributory negligence.''

Appellant contends that it was error to apply the rule of the Kleinclaus case to the situation in the instant case. Appellant argues: ''The difference between the Kleinclaus case and the case at bar is readily apparent, and it is our contention that the use of the Kleinclaus case to bar defendant as a matter of law from introducing the excluded evidence is a misapplication of the doctrine and an unwarranted extension of the principle enunciated in the Kleinclaus case. In the latter case the plaintiff did not create nor assist in creating the force that damaged it. In the case at bar plaintiffs' subrogor was sending out of its premises the force which caused its damage and it was the recoil of that force onto its premises which caused the damage complained of. In the Kleinclaus case the plaintiff was not carrying on a hazardous activity in so far as it added to the particular damage complained of.

In the case at bar plaintiffs' subrogor was using its property for an ultra-hazardous activity.''

It may be conceded that respondents' subrogor was devoting its property to an extraordinary use, an ultra-hazardous activity, but we are unable to see how that fact makes inapplicable the rule of the Kleinclaus case, and appellant has cited no case which so holds. It is true that a very high duty is placed upon a power company in the construction and maintenance of its equipment, so as to avoid injury to persons or property in the handling of such a highly dangerous instrumentality. As said in Shearman and Redfield on Negligence, volume 4 (rev. ed.) page 1752, in regard to a gas company (and the same may be said to apply to an electric power company) : ''It is the duty of a gas company to build all its works, lay its pipes, and carry on its business, in such manner as to avoid injury to the property of others by the escape of gas, or of the materials employed in making it, or of the washings and refuse. To this end, the company is bound to use a degree of care and skill proportioned to the danger reasonably to be anticipated, which it is its duty to avoid,'' and at page 1759, the same author says : ''The business of supplying the public with electricity, like that of supplying gas, for lighting or other purposes, involves the handling of a highly dangerous agent, and therefore requires a corresponding degree of care on the part of one who undertakes it, to prevent injury to persons lawfully in any place where his wires are strung, whether over a highway or on a housetop.'' (See *Holmes* v. *Southern Cal. Edison Co.*, 78 Cal.App.2d 43, 55 [177 P.2d 32] ; *Anstead* v. *Pacific Gas & Electric Co.*, 203 Cal. 634, 638 [265 P. 487] ; *Fairbairn* v. *American River Electric Co.*, 179 Cal. 157 [175 P. 637] ; *Lozano* v. *Pacific Gas & Electric Co.*, 70 Cal.App.2d 415 [161 P.2d 74] ; *Irelan-Yuba etc. Mining Co.* v. *Pacific Gas & Electric Co.*, 18 Cal.2d 557 [116 P.2d 611] ; *Giraudi* v. *Electric Imp. Co.*, 107 Cal. 120 [40 P. 108, 48 Am.St.Rep. 114, 28 L.R.A. 596] ; *Anderson* v. *Southern Cal. Edison Co.*, 77 Cal.App. 328 [246 P. 559] ; *Bergen* v. *Tulare County Power Co.*, 173 Cal. 709 [161 P. 269].) However, none of the above cases cited by appellant throw any light on the question here involved, for none of those cases were concerned with a situation where a power company was bringing an action for damage to its property by the negligent act of the other party. The cases do, of course, emphasize the idea that the furnishing of electricity

is an ultrahazardous activity and that great care must be exercised to avoid injury to the persons or property of others.

As we view the matter the principal question involved in the instant case is not a difficult one. Here it is admitted that due to the negligent operation of appellant's Belt Line Railroad a freight car was thrown from its tracks and down an embankment, falling against a power pole of the Pacific Gas and Electric Company (respondents' subrogor) which was 9 feet northerly of the nearest rail of said track; that the impact of said car broke the pole off at the ground level, splintering it for a distance of 6 feet or more above the ground and that two other poles were broken by the strain thrown on them; that the shattering and displacement of the pole struck by said car, and of the pole to the west caused a sag in the Q1102 wires dropping them onto the wires leading northerly along Beach Street, and that as a result of such contact all of said wires shorted, burned off and fell into the street. The trial court found, upon sufficient evidence, "That at that time a fire occurred at generating station 'Q' of the said Pacific Gas & Electric Company; which fire was caused by the unusually heavy stress on the power system of Pacific Gas & Electric Company, due to said short circuit at said pole in close proximity to said Station 'Q'; that as the result thereof an arc was generated inside the current regulator inside said station, on the Blue phase of said Q-1102KV Feeder, which arc ignited the insulating oil in said regulator, causing an explosion which threw out said burning oil, resulting in flames which spread and were communicated to inflammable and electric equipment, resulting in damage thereto and to said station 'Q' in the agreed sum of $52,617.56.''

How under such circumstances there could be a defense that there was contributory negligence on the part of the power company which proximately contributed to the fire in the substation we are unable to understand. If the freight car had not been thrown from its track by the admitted negligence of appellant there would have been no fire in the substation. The power company was conducting a lawful enterprise on its own property, and on property over which it had a right of way, under regulation of the Public Utilities Commission, and we do not believe it could be expected to anticipate and guard against any such accident as occurred in the instant case. If appellant's theory were correct it would be interesting to try to calculate what degree of precaution would have to be taken by the power company to

avoid the defense of contributory negligence. As stated by the U. S. Supreme Court in *LeRoy Fibre Co.* v. *Chicago, M. & St. P. Ry. Co., supra,* ''Depart from the simple requirement of the law, that every one must use his property so as not to injure others, and you pass to refinements and confusing considerations.''

We believe that the rule expressed in the Kleinclaus case that a ''landowner may make any lawful use of his land and that it is not contributory negligence to neglect to take precautions to avoid future injury which can only occur as the result of another's negligence'' is applicable to the facts of the instant case and the trial court correctly ruled against the admission of the evidence offered by appellant.

The additional argument of appellant that the evidence excluded by the court would have tended to show that respondents' subrogor failed to mitigate damages is but a repetition of its argument on contributory negligence for it could scarcely be contended upon the record here that there was any time after the breaking of the wires causing the short circuit resulting in the explosion in the regulator and the fire. There is no contention that respondents' subrogor did not do everything in its power to fight the fire caused by the explosion in the substation.

In view of the foregoing we believe that the judgment should be and the same is hereby affirmed.

Nourse, P. J., and Dooling, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 10, 1951. Schauer, J., did not participate therein.