[Civ. No. 20810. First Dist., Div. One. Sept. 16, 1963.]

COUNTY OF HUMBOLDT, Plaintiff and Appellant, v. NOLA FERN SHELLY, as Administratrix, etc., Defendant and Respondent.

Thomas M. Montgomery, County Counsel, for Plaintiff and Appellant.

Bronson, Bronson & McKinnon and Thomas B. Swarty for Defendant and Respondent.

SULLIVAN, J.—Plaintiff County of Humboldt (hereafter referred to as County) appeals from an adverse judgment entered on a jury verdict in an action for damages for the destruction of a bridge.

The complaint is in two counts. The first count sets forth a cause of action against the driver and owners of a certain Peterbilt logging truck, alleging in substance that one Brown, the driver thereof, so negligently operated said truck on May 11, 1957, "at or about *11:00* a.m." as to cause it to collide with and demolish plaintiff's bridge to plaintiff's damage in the sum of $100,000. The second count against respondent as administratrix of one Shelly, the owner and driver of a certain GMC logging truck and trailer, alleges that Shelly so negligently operated his truck and trailer on May 11, 1957 "at or about 11:*15* a.m." as to cause such vehicles to collide with and demolish the bridge to plaintiff's damage in the same amount. The defendant administratrix admitted that the decedent Shelly was the owner and driver of the above truck and trailer at the time and place alleged, but otherwise denied the material allegations of the second count and, pursuant to permission granted by the court in its pretrial conference order, asserted the affirmative defense of contributory negligence. The case proceeded to

trial only against the defendant administratrix.[1]

The facts in the main are not in dispute. The County owned a bridge known as the Roberts Bridge which crossed the Mattole River 2 miles south of the town of Petrolia and was part of the public highway system of the county. It had been built prior to 1905 and according to the witness Shaller, Director of Public Works for the County, "probably about 1900." It was approximately 200 feet long and 15 feet wide over the traveled portion, thus providing for only one-way traffic. It was constructed of steel, except for the deck structure which was wood. Mr. Shaller described the Roberts Bridge as "[a] through truss bridge with overhead wind bracing, . . ."

The bridge had been inspected by the same state engineer on May 18, 1950, and again on May 12, 1955. Both inspections were made at the request of the County and upon completion, written reports of the inspection, prepared by the state engineer, were transmitted to the County and copies thereof filed with the county clerk.[2] These inspections were requested in order to determine the maximum safe load capacity of the structure and thus enable the County to post legal load limits on the bridge. The 1950 report gave a detailed description of the condition of the bridge, made recommendations for certain repair and reconstruction work,[3] and also made recommendations for posting the bridge for load and speed limits, specifying, *inter alia,* a load limit of 28 tons for truck and full trailer. However, outside of reconstructing part of the deck of the bridge and the doing of some repainting, no other work was done on the bridge between the time of the 1950 bridge report and the time of the 1955 report.

The 1955 supplementary bridge report noted that apart from the cleaning and repainting of the structural steel

---

[1] The County settled its cause of action against Brown for $5,000. Shortly before trial, the County filed a dismissal without prejudice against all defendants named in the first count.

[2] Both reports were received in evidence and have been transmitted to this court.

[3] The report noted that a portion of the bridge railing had been demolished by traffic, that many of the floor planks were split or partially decayed but not seriously from a safety standpoint, that several of the stringers underlying the deck were "reduced greatly in effective cross-sectional area by decay," that some of the structural steel members were damaged by rust and recommended that such conditions be eliminated by appropriate repair or reconstruction.

members and the replacement of the deck, no other work of any kind had been done to strengthen the bridge since the 1950 inspection. The supplementary report noted that the recommended repair and reconstruction of the stringers (see footnote 3, *ante*) had not been done and that at the time of the 1955 inspection "about one-third of the stringers in the three westerly spans are very seriously decayed and in need of immediate replacement." It stated that to effect adequate strengthening "would require strengthening the stringers in the approach spans and placing supplementary stringers between the original ones on the truss span." This work was never done. The 1955 report also noted certain damage to a vertical structural steel member and to the flanges of the end posts at the Petrolia end of the bridge as a result of having been hit by traffic. Recommendation was made for the straightening of such damaged members with the observation that "[t]he structural steel members are in good condition otherwise." The report also called attention to the fact that during the time of investigation several loads of logs of much greater weight than the legally permissible maximum for highways were seen crossing the bridge; that the bridge could not safely support such traffic; and that repeated overloads could seriously weaken the structure so that it could fail under even lighter loads than those for which it was posted.

The report concluded that the bridge was "too light a design to support the 1955 traffic at the location safely." It recommended legal load limit posting at 24 tons (instead of 28 tons) for a truck and full trailer, adding the note that "[a]ssuming normal necessary maintenance to the bridge and barring serious physical damage, the capacity rating set forth in this report may be considered to be effective for a period of not exceeding one year."

The contents of both of the foregoing bridge reports were fully known to the responsible officials of the County. Such officials were aware of the fact that the Roberts Bridge was not suitable for normal highway logging loads and that, notwithstanding this condition, it was common practice for loggers to take loads over it which were in excess of posted limits. The County received complaints about the bridge and planned to replace it because it was one of the most abused and outdated of the County's bridges.

Nevertheless the County never requested another inspection of the bridge prior to its collapse in 1957 in the course of the

events now engaging our attention. The bridge was damaged by the flood of December 1955. This damage was repaired in 1956. At the trial, the witness Shaller maintained that whatever other existing damage there was to the bridge was repaired at the same time, although he had not so testified in his deposition. After 1955, no change was ever made in the posted load limits.

On the morning of May 11, 1957, Samuel M. Brown, an employee of O. M. Gann[4] drove a truck with a load of logs across the bridge in a northerly direction. There were three logs on the truck piled in the form of a pyramid: two 32-foot logs at the base and a 40-foot log or ''peaker'' at the top. Thus the ''peaker'' extended in the rear some 5 to 8 feet beyond the bottom logs. The truck and its load weighed approximately 43 tons, of which the load itself weighed 30 tons. As Brown made a left turn off the northerly end of the bridge, the end of the top log struck the bridge. He stopped his truck, got out and went back to see what damage had been done. Brown then noticed that one of the lips of a girder on the east side had been bent at a point approximately 8 to 10 feet above the road surface which corresponded generally to the height of the ''peaker.'' The girder itself was neither bent nor bowed. According to Brown, he barely felt the jolt and it was not even necessary for him to tighten the log binders. He felt that no serious damage had been done, proceeded on his way to Ferndale, but was stopped en route by a deputy sheriff who told him that the bridge had collapsed.

At approximately 11 a.m., Deputy Sheriff Eckhardt was notified by the telephone operator at Petrolia that the Roberts Bridge had been damaged by a truck. He drove to the bridge immediately and arrived there in about two or three minutes. He saw that the main girder had been ''sprung out of shape'' about 10 inches and the pavement against the abutment of the bridge ''was cracked out considerable inches'' from the main abutment of the bridge. He thought the condition was dangerous. The defendant's decedent Shelly was already at the bridge with his loaded diesel logging truck. Eckhardt decided not to permit anyone to cross the bridge until he could have an inspection made of it. According to him, he was at his car, trying to establish radio contact with the sheriff's office, when the collapse of the bridge occurred.

---

[4]Brown and Gann were defendants on the first count which was settled and dismissed. See footnote 1, *ante.*

Here we find the evidence somewhat in conflict. According to Deputy Sheriff Eckhardt, called as a witness by the County, he told Shelly that the bridge was dangerous and that he would not permit Shelly to cross; that Eckhardt then went back to his sheriff's car which was about 18 feet from the westerly side of the bridge so as to radio for help; that while Eckhardt had the microphone in his hand, Shelly started up his truck and proceeded to cross the bridge; and that when the rear wheels of the trailer were fully on the bridge, the bridge began to buckle where it had been damaged previously and collapsed slowly into the river. However, Eckhardt at no time moved his car into a position where it blocked the approach to the bridge nor did he attempt to place barricades across the approach. According to the witness Arthur B. Fisher, also called by the County, he was working on a hill on the south end of the bridge and saw Shelly and Eckhardt (both of whom he knew) standing at the approach to the north end of the bridge some 300 to 400 yards away. Fisher had a downhill view of the scene. He saw Shelly's truck and trailer partially facing the bridge and generally in a position to pull onto the approach. Eckhardt's car was partially blocking the approach to the bridge so that the truck could not go on the bridge unless the deputy sheriff moved his vehicle. Fisher occupied himself with his work on the hill and paid no more attention to the scene at the bridge until he heard a loud noise from that direction and looking down saw the bridge collapse. Fisher ran down from the hill and across the tangled structure. At that time he noticed that Eckhardt's car was not where he had first seen it blocking the approach to the bridge but about 100 feet away from the bridge and facing in the opposite direction.

Shelly was trapped in his truck which, along with its trailer, had fallen into the river. Eckhardt left to get an acetylene torch with which to cut him out of the cab but, although he returned with it in a matter of minutes, on his return, Shelly was already dead.

The court instructed the jury, *inter alia*, on contributory negligence and on the County's duty with respect to the dangerous and defective condition of County property. The jury returned a verdict on a standard form for a plaintiff's verdict but inserted therein the words ''No Damages'' and ''Due to Contributory Negligence.''[5] A judgment on this

[5] The verdict reads as follows: "We, the Jury in the above entitled action, find in favor of Plaintiff(s) COUNTY OF HUMBOLDT and

verdict was thereafter entered which provided that the County "take nothing by virtue of its complaint, and that said defendant NOLA FERN SHELLY administratrix of the estate of RICHARD NOEL SHELLY, deceased, have and recover her costs and disbursements incurred in this action, . . ."

■ The record does not show that plaintiff made any objection to the form of the verdict when it was returned by the jury or any request of the court that the verdict be corrected or clarified. Plaintiff thereby waived any right to complain as to its form. (*Lynch* v. *Birdwell* (1955) 44 Cal.2d 839, 851 [285 P.2d 919]; *Brown* v. *Regan* (1938) 10 Cal.2d 519, 523 [75 P.2d 1063]; *Bisnett* v. *Hollis* (1962) 207 Cal. App.2d 142, 150 [24 Cal.Rptr. 231].) We think that the court by entering judgment on the verdict for defendant properly construed the verdict so as to give it the effect intended by the jury. (*Johnson* v. *Visher* (1892) 96 Cal. 310, 314 [31 P. 106].) Indeed plaintiff does not here question such construction of the verdict. Plaintiff argues that the form of the verdict indicates that the jury thought Shelly was negligent. In view of our conclusions herein, we deem it unnecessary to consider this argument.

The basic question presented to us is whether the defendant was entitled to raise the defense of contributory negligence and therefore whether the trial court properly instructed the jury that such contributory negligence would bar recovery by the County. No question is raised as to the form of such instructions. Plaintiff takes the position that contributory negligence had no proper place in the case, resting on two arguments: (1) that the doctrine of contributory negligence does not apply in a property damage action of this type; and (2) that the doctrine of dangerous and defective condition (also a subject dealt with in the instructions) is inapplicable against a local agency which is a *plaintiff* in a property damage action.

While a number of cases have held that the doctrine of contributory negligence cannot be raised as a defense in a property damage action, we do not share plaintiff's views as to the broad and unlimited scope of such a rule and are persuaded that such situations are clearly distinguishable

---

against Defendant(s) NOLA FERN SHELLY administratrix of the estate of RICHARD NOEL SHELLY, deceased and assess damages in the sum of NO DAMAGES, dollars. DUE TO CONTRIBUTORY NEGLIGENCE. Dated this 18 day of January, 1962 RAY ALEXANDER FOREMAN''

from the one at hand. Indeed this seems apparent from the rationale of plaintiff's cited authorities. To support its first argument, plaintiff relies on *Kleinclaus* v. *Marin Realty Co.* (1949) 94 Cal.App.2d 733 [211 P.2d 582], *Atlas Assurance Co.* v. *State of California* (1951) 102 Cal.App.2d 789 [229 P.2d 13] and *LeRoy Fibre Co.* v. *Chicago, M. & St. Paul Ry. Co.* (1913) 232 U.S. 340 [34 S.Ct. 415, 58 L.Ed. 631].

In *Kleinclaus, supra,* it was held that plaintiffs' blocking of a natural drainage ditch running across their own property did not constitute contributory negligence barring recovery for the flooding of their land through the negligence of the defendants, since "plaintiffs were under no duty to anticipate defendants' negligent invasion of their land or to have any drainage facilities on their land to carry off water negligently cast thereon by defendants." (P. 736.) In *Atlas Assurance Co., supra,* it was held that the failure of a utility company (plaintiff's subrogor) to maintain equipment adequate to handle a short circuit did not constitute contributory negligence barring recovery against the defendant state which caused the short circuit through the negligent operation of its railroad. In *LeRoy Fibre, supra,* which is relied upon in both of the foregoing cases, the storing of inflammable flax by plaintiff on his own property but near defendant's railroad right-of-way, was held not to be contributory negligence barring recovery by the owner for the destruction of the flax by fire caused by the negligent operation of a locomotive.

The underlying principle upon which the foregoing cases turn is that a person has a right to make any lawful use of his own property and cannot be charged with contributory negligence for his failure to anticipate and guard against damage thereto resulting from the negligent invasion by another. As the court stated in the *LeRoy Fibre* case, *supra,* "the rights of one man in the use of his property cannot be limited by the wrongs of another." (232 U.S. at p. 350 [58 L.Ed. at p. 634].)

This rationale is inapplicable to the case before us. In each of plaintiff's· cited cases there was some invasion of the property there involved, committed by third persons who were without any right or permission to go upon or use such property. Under such circumstances, the owner of the property could not be charged with any duty to anticipate such invasion. On the other hand, the instant case involves no invasion of the County's property. The bridge which is the

subject of the present controversy was part of the highway system of the County and was open to the use of the public. (Veh. Code, § 360; Sts. & Hy. Code, § 23.) Shelly, defendant's decedent, had a right to use the bridge. Unlike the situations presented in the foregoing cases where the property owner was not required to anticipate the invasion of his property by others, the circumstances of the instant case by their very nature presuppose the constant use by others of the structure in question. We do not agree with plaintiff that the cited authorities compel an exclusion of the doctrine of contributory negligence.

While we have found no California case squarely decisive of the question before us, defendant has directed our attention to a number of cases, involving damage to bridges, where the doctrine of contributory negligence has been applied. In *People* v. *Lang Transportation Corp.* (1941) 43 Cal.App.2d 134 [110 P.2d 464], an action brought by the state for damage to one of its bridges, the answer raised contributory negligence as a separate defense and the trial court gave instructions on contributory negligence. In the course of reviewing an instruction on appeal, the court observed that "the state also was required to use due care in the maintenance of the bridge before it could recover." (P. 144.) The court also reviewed the instructions on negligence and contributory negligence in connection with appellant's claim that the burden of proof on contributory negligence had been "shifted." While appellant's claim of error on appeal seems to have been limited to this point, the reviewing court did examine the pertinent instructions and concluded that " [t]he jury was correctly instructed as to the meaning and effect of preponderance of evidence and the burden of proof, and was clearly told that contributory negligence was an affirmative defense, and that the burden of proving contributory negligence was upon the defendants." (P. 144.) We believe this indicates some approval of the application of the doctrine for it is reasonable to assume that the court would have given a contrary indication if it felt that the doctrine was "entirely out of place." (*LeRoy Fibre Co.* v. *Chicago, M. & St. Paul Ry. Co., supra,* 232 U.S. 340, 350 [58 L.Ed. 631, 634].)

In *City of Baraboo* v. *Excelsior Creamery Co.* (1920) 171 Wis. 242 [177 N.W. 36] recovery was denied the city because the dangerous and defective condition of the approach to the bridge contributed to the collision of defendant's truck with the bridge. The court stated: "In order to entitle plaintiff to

recover, it must appear not only that the driver of the truck was negligent in the manner in which he managed the same, but that no deficiency of the highway contributed to produce the collision. . . . It is a well-settled principle of negligence law that any want of ordinary care, no matter how slight, on the part of the plaintiff, which proximately contributes to the injury, amounts to contributory negligence. We can see no reason why this principle is not applicable in the case of a city suing for damages to which the defective condition of its streets contributed." (Pp. 37-38 [177 N.W.].)

In *Department of Highways* v. *Jones* (La.App. 1948) 35 So.2d 828, recovery was denied because of the contributory negligence of the state in failing to give warnings of load limits. "It might well be that defendant was guilty of such negligence as would have precluded the recovery of damages which he might have sustained. But this is not such an action, and it appears exceedingly clear to us that, conversely, the plaintiff herein is chargeable with the result of its failure to take and maintain reasonable precautions which would have prevented damage to its own property, for which it now seeks recovery." (P. 832.) See also: *Department of Highways* v. *Fogleman* (1946) 210 La. 375 [27 So.2d 155], where, under similar facts, recovery was also denied on the grounds of the state's contributory negligence. In accord: *Township of Livingston* v. *Parkhurst* (1939) 122 N.J.L. 598 [7 A.2d 627].

We believe that the principles found in these last mentioned cases are not only properly applicable to the facts of the case before us but also in such application make good sense. Moreover, we are of the view that to so apply them here comports with fairness and justice. As we have already indicated, we are not faced with a problem arising out of the wrongful or negligent invasion of property rights. The bridge was available for use by vehicular traffic and it seems only right that if the negligence of the County and its agents proximately contributed to its destruction, the County should not be permitted to escape responsibility for its own conduct. (Cf. *City of Baraboo* v. *Excelsior Creamery Co., supra,* 171 Wis. 242 [177 N.W. 36]; *Department of Highways* v. *Jones, supra,* (La.App.) 35 So.2d 828. We conclude that the doctrine of contributory negligence was properly assertable.

This brings us to plaintiff's second argument. In addition to giving a general instruction defining and ex-

plaining contibutory negligence, the court instructed the jury in substance as follows: that the County was under a duty to use ordinary care in the management of its property; that in determining whether the County used ordinary care, the jury might consider whether the bridge was in a dangerous or defective condition, whether the County officials had notice thereof, and whether the County failed within a reasonable time thereafter to take necessary action to prevent damage to the bridge; and in considering whether the condition of the bridge was dangerous and the County was negligent in allowing such condition to exist, the jury should consider the use to which the bridge was intended to be put and in fact put.

It is argued that the only source for the language "dangerous or defective condition" is the Public Liability Act (see Gov. Code, § 53051), that such "doctrine" applies in actions *against* local agencies and not in those where they are *plaintiffs*, and that the use of the language in the above instructions "created a burden which plaintiff county is not legally obligated to meet."

We do not agree. As we have pointed out, the defense of contributory negligence is one properly raised in the instant case and therefore one which the County *is* "legally obligated to meet." The jury were merely told that in determining the issue of contributory negligence they could consider whether a dangerous or defective condition existed which after notice the County failed to meet with preventive action. Clearly, if these circumstances were found to exist, the jury could logically conclude that the County had been derelict in its duties and negligent in permitting the condition to exist without correction. (See *City of Baraboo* v. *Excelsior Creamery Co., supra,* 171 Wis. 242 [177 N.W. 36]; *Department of Highways* v. *Jones, supra,* (La.App.) 35 So.2d 828.) ▮ The fact that the factors of "dangerous or defective condition," notice and failure to remedy constitute the basis for the statutory imposition of liability in cases arising under the Public Liability Act does not preclude such factors from being considered in determining whether the County's conduct fell short of the standard to which a reasonable person should conform in order to protect himself from harm. (Rest., Torts, § 466.) The issue of what constitutes a dangerous or defective condition is basically the same as the issue of what constitutes negligence, since in each it is to be considered whether an unreasonable risk is involved. (See 2 Witkin, Summary of Cal.

Law, 1204; *Jones* v. *City of Los Angeles* (1951) 104 Cal. App.2d 212 [231 P.2d 167].) Thus the general tenor of the instructions given in the instant case was that the County could be considered negligent by permitting a dangerous condition of the bridge to exist without correction. By expressing this in terms of contributory negligence, the court placed the County at no disadvantage since the standard applied in determining the contributory negligence of a plaintiff is the same as that applied in determining the negligence of a defendant. (35 Cal.Jur.2d, Negligence, § 217, p. 742.)

The judgment is affirmed.

Bray, P. J., and Molinari, J., concurred.